**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | | |
| | ) | | |
| v. | ) | No. | **14-cr-201 & 15-cr-164** |
| | ) | | **(RMC)** |
| | ) | | |
| **ERNEST T. BOYKIN, III,** | ) | | |
| | ) | | |
| Defendant. | ) | | |
| _____ | ) | | |

**Emergency**
**Motion for Compassionate Release**
**18 U.S.C. § 3582(C)(1)(A)(i)**

**Introduction**

Mr. Ernest T. Boykin III, through undersigned counsel, respectfully moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  Mr. Boykin, an African-American male, suffers from asthma, obstructive sleep apnea, hypertension, severe obesity, prediabetes, and a mental health disorder, among other health conditions.  Covid-19 has now killed 66 federal inmates, has sickened thousands more, and has already taken root inside Mr. Boykin's institution, Rivers CI.  Mr. Boykin therefore asks this Court to order his immediate release, so that he may protect himself at his parents' home, rather than live in the "petri dish[]" of an institution with 1,197 inmates and countless correctional officers, where the risks of infection cannot be overstated.[1]

**Background**

**I.      Conviction and Sentencing.**

In September 2014 in Case No. 14-cr-201, Mr. Boykin was indicted on one count of conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin, in violation of 18 U.S.C.

---

[1]      *See* NPR, *Barr: Federal Prisons Mustn't Become 'Petri Dishes' For Coronavirus* (Mar. 26, 2020), https://perma.cc/9KVM-JE6B; *see also* BOP, *Rivers CI*, https://www.bop.gov/locations/ci/riv/ (accessed May 30, 2020).

§§ 846, 841(a)(1) & 841(b)(1)(A)(i) (Count 1), and using, carrying, or possessing a firearm during a drug

trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count 2).  Mr. Boykin was also charged in the

District of Maryland (14-cr-490), with possession of a firearm by a prohibited person, in violation of 18

U.S.C. § 922(g) (Count 1), and possession with intent to distribute 1 kilogram or more of heroin, in

violation of 18 U.S.C. § 841(a)(1) & 841(b)(1)(A)(i) (Count 2).  The Maryland case was transferred to

this district as Case No. 15-cr-164.

The parties entered into a Federal Rule of Criminal Procedure 11(c)(1)(C) agreement disposing of

both cases.  Mr. Boykin agreed to plead guilty to Count 1 in No. 14-cr-201 and Counts 1 and 2 in No. 15-

cr-164, with the parties agreeing to concurrent terms of 15 years of imprisonment and 5 years of

supervised release in both cases.  *See* Plea Ag't at ¶¶1 & 4, ECF No. 61 (No. 14-cr-201).  The plea

agreement indicated that, under the Sentencing Guidelines, Mr. Boykin qualified as a career offender with

a Guidelines range of 262 to 327 months.  *Id.*

Mr. Boykin pleaded guilty in front of Judge Collyer in November 2015.  A presentence

investigation report (PSR) also concluded that Mr. Boykin was a career offender, and based this on a

2013 Maryland possession with intent to distribute heroin offense, and on a 1998 D.C. distribution

cocaine offense that, absent a later parole violation, would have otherwise been too old to qualify as a

prior offense.  PSR ¶¶64, 66.  The 2013 offense involved 11.5 grams of heroin and the 1998 offense

involved $20 worth of cocaine.  *Id.*  The PSR explained: "The defendant's [1998] conviction [] qualified

as a predicate offense for the Career Offender provision only because of the probation revocation he

received in 2000, which was the result of his drug use and failure to complete drug treatment.  Absent that

revocation, and his subsequent parole in 2002, that conviction would not have been assessed criminal

history points."  *Id.* ¶158.  Without the career offender enhancement, Mr. Boykin's range would have

been 121 to 151 months of imprisonment.

The PSR noted that Mr. Boykin suffered from asthma, sleep apnea requiring a Continuous

Positive Airway Pressure (CPAP) machine, hypertension, and mental health conditions; had survived

being shot in the head in a robbery attempt in 2003 and being struck by a car in 2009 (he suffered a

broken tibia and a humerus fracture on his right shoulder, and was fitted with a titanium plate on the right side of his face that affects his sinuses); and was overweight. *Id.* ¶¶92, 94-95, 97. The PSR also detailed that Mr. Boykin had long suffered from a substance abuse disorder, starting with alcohol at age 8 and drugs at age 13. *Id.* ¶¶101-108. The PSR described an all-too-common cycle for those suffering from substance abuse disorders whereby Mr. Boykin was prescribed Oxycontin and Percocet following his accident in 2009; he became addicted, but the drugs were expensive; he turned to heroin as a pain management tool and because it was cheaper; and then he sold drugs to support his increasing need for heroin and eventually amphetamines. *Id.* ¶¶106-108.

Judge Collyer imposed concurrent sentences of 15 years of imprisonment and 5 years of supervised release in each case. *See* Judgment (Feb. 18, 2016), ECF No. 72 (No. 14-cr-201); Judgment (Feb. 16, 2016), ECF No. 16 (No. 15-cr-164).[2] In each judgment, Judge Collyer recommended that Mr. Boykin be allowed to participate in the 500-hour drug treatment program (known as RDAP) and that he be designated to FCI Butner. Mr. Boykin did not appeal and has not filed any other collateral challenges to his convictions or sentence.

## II.     Mr. Boykin's Health Conditions in the BOP.

Mr. Boykin was not designated to FCI Butner and he was only referred for RDAP in January 2020 and has yet to be offered a spot (the program is always oversubscribed and not available at all BOP facilities). *See* Sealed Ex. A (Inmate Profile). His health conditions are serious and have become more so over time. He continues to suffer from hypertension, with elevated blood pressure documented in his medical records as recently as May 8, 2020. *See* Sealed Ex. B at 3 (2019 & 2020 Vitals). Mr. Boykin's systolic blood pressure readings are consistently 140 or higher and his diastolic blood pressure readings are consistently 90 or higher. *Id.* Because of his repeated high blood pressure readings, Mr. Boykin takes

---

[2]     Counsel has ordered the sentencing transcripts, but they have not been produced by the time of this submission.

two daily hypertension medications: amlopidine and hydrochlorothiazide.  *See* Sealed Ex. C (Chronic

Care Treatment Plan 4/14/2020).

Mr. Boykin was recently diagnosed with mild hypertensive retinopathy, which is "retinal vascular

damage caused by hypertension."[3]  *See* Sealed Ex. D at 2 (Inmate Intra-system Transfer Form 1/23/2020).

When he was diagnosed, he was told that this condition indicates that his hypertension has long been a

concerning condition.

Mr. Boykin also continues to struggle with "severe OSA [obstructive sleep apnea]," for which he

must daily use a CPAP machine as he sleeps.  *See* Sealed Ex. E (Devices & Equipment).  He has a body

mass index (BMI) of 40-41, which is considered severely obese and at risk for serious health

complications from obesity.[4]  *See* Sealed Ex. F (Follow-up Chronic Care Treatment Plan 4/14/2020).  A

March 2020 blood test revealed that he is now considered to have "prediabetes."  *See* Sealed Ex. G

(LabCorp 3/25/2020).

Mr. Boykin also has seasonal allergies and a documented history of chronic asthma, for which he

has been prescribed an albuterol inhaler.  *See* Sealed Ex. H (Problem List) & Sealed Ex. I (Current Long-

Term Medications).  Coming down with a simple cold, dust, being confined in close quarters, animals,

grass, and ragweed all trigger and amplify his asthma.  Because it is allergy season and he is confined in

close quarters, he is lately using his inhaler more often, and up to two to three times a day when he feels

like he may experience wheezing or shortness of breath.

He also has a skin condition known as dermatophytosis, and has repeatedly had skin conditions

throughout his incarceration, including a serious and painful episode of cellulitis while housed in transit at

---

[3]        Sonia Mehta, *Hypertensive Retinopathy*, Merck Manual (Jun. 2019), https://perma.cc/CY7S-N7Z3.

[4]        CDC, *Defining Adult Overweight and Obesity* (Apr. 3, 2020), https://www.cdc.gov/obesity/adult/defining.html.

MDC Brooklyn, which required his hospitalization for 19 days.[5]  *See* Sealed Ex. H & Sealed Ex. J (Health Problems).

Mr. Boykin's medical records also document that he suffers from a recurrent major depressive disorder.  *See* Sealed Ex. J.  This began as PTSD after being shot in the 2003 robbery attempt and being hit by the car in 2009, and became a pronounced struggle with recurrent depression after his mother's sudden death from a pulmonary embolism in January 2011.  PSR ¶¶81, 98.  He has been on antidepressants in the past, but is currently trying to manage his symptoms without medication.

**III.      The Emergence of the Covid-19 Pandemic.**

On March 11, 2020, the World Health Organization ("WHO") officially classified the spread of Covid-19, the disease caused by the novel coronavirus, as a pandemic.[6]  On March 13, 2020, the President of the United States declared the Covid-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*[7]

In the weeks since these pronouncements, Covid-19 has continued to spread at an alarming rate. Over 5.8 million people have been infected globally, and over 360,000 have died.[8]  In the United States, more than 1.7 million people have been infected and over 100,000 people have died.[9]  The numbers increase sharply every day and almost certainly underrepresent the true scope of the crisis, given the widespread unavailability of test kits to detect the virus.  To stem the spread of the disease, the Centers for Disease Control ("CDC") broadly advised people to take basic preventive actions, such as avoiding

---

[5]      Cellulitis is an infection of the skin and deep underlying tissues, which, if left untreated, can rapidly become life-threatening.  *See* MedlinePlus, *Cellulitis*, https://medlineplus.gov/cellulitis.html; Mayo Clinic, *Cellulitis*, https://perma.cc/6VYF-NTGG.

[6]      *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

[7]      The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (March 13, 2020), https://perma.cc/Q8MX-PRDG.

[8]      *Coronavirus Map: Tracking the Global Outbreak*, N.Y. Times (May 29, 2020), https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html.

[9]      *Id.*

crowds, staying six feet away from others, keeping surfaces disinfected, and frequently washing their hands or using hand sanitizer.[10]

Cases continue to grow because of the disease's very nature.  Most obviously, the virus is wildly infectious.  It survives "on surfaces for days."[11]  Unlike many diseases, "the virus can remain viable and infectious in aerosols for hours"—just breathing will spread the virus, no cough or sneeze required.[12]  In a soon-to-be-published study in a CDC journal, researchers confirmed what was already suspected: "SARS-CoV-2 aerosol was detected" in hospitals up to four meters from infected patients.[13]  Additionally, Dr. Harvey Fineberg, Chair of the National Academy of Medicine's committee on emerging infectious diseases, reported that all available studies were showing "aerosolization of [the] virus from normal breathing."[14]  He noted how seemingly slight movements can stir up the virus into the air: simply the "doffing of PPE [personal protective equipment], the cleaning of floors, or the movement of staff" may be enough to re-suspend "virus-laden aerosol."[15]

Important in the context of a congregate living facility like a prison is the concept of "viral dose" or "viral load":  "As with any other poison, viruses are usually more dangerous in larger amounts. Small initial exposures tend to lead to mild or asymptomatic infections, while larger doses can be lethal."[16]

---

[10]     *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others*, cdc.gov (Apr. 24, 2020), https://perma.cc/B5BA-TATF.

[11]     Mary Van Beusekom, *U.S. Studies Offer Clues to COVID-19 Swift Spread, Severity*, Cntr. for Infectious Disease Research & Policy (Mar. 18, 2020), https://perma.cc/6EW5-S6GD.

[12]     *See id.*

[13]     Guo Zhen-Dong, et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 In Hospital Wards, Wuhan, China*, Emerging Infectious Disease (July 2020), https://www.cdc.gov/eid/article/26/7/20-0885_article (peer-reviewed journal published by the CDC).  The study found that, even in hospitals, the "virus was widely distributed on floors, computer mice, trash cans, and sickbed handrails."  *Id.*

[14]     Letter from Dr. Harvey Fineberg, Nat'l Acad. of Med., to Kelvin Droegemeier, Ph.D., Office of the President (Apr. 1, 2020), https://www.nap.edu/read/25769/chapter/1.

[15]     *Id.* at 2.

[16]     Joshua D. Rabinowitz & Caroline R. Bartman, *These Coronavirus Exposures Might Be the Most Dangerous*, N.Y. Times, https://perma.cc/BN28-XJDX.

Thus, "not all exposures to the coronavirus" are the same: "Stepping into an office building that once had

someone with the coronavirus in it is not as dangerous as sitting next to that infected person for an

hourlong train commute;" sitting next to an infected person for an hourlong train commute, in turn, is not

as dangerous as living alongside dozens of other inmates, all of whom are shedding the virus in a closed

setting with shared surfaces and inadequate ventilation.[17]  In the latter scenario, each individual is in

danger from "high-dose exposures" because "[i]n-person interactions are more dangerous in enclosed

spaces and at short distances, with dose escalating with exposure time."[18]

**IV.     The Covid-19 Crisis Within the Bureau Of Prisons.**

Incarcerated people "are at special risk of infection" and are "less able to participate in proactive

measures to keep themselves safe."[19]  And the conditions in BOP facilities provide a uniquely hospitable

environment for Covid-19 to spread.  *See* Ex. A at 1 (Letter from Public Health Experts to President (Mar.

27, 2020)).[20]  As courts have recognized, there can be no doubt that "the COVID-19 virus spreads with

uncommon and frightening speed in carceral settings."  *United States v. Skelos*, 2020 WL 1847558, at *1

(S.D.N.Y. Apr. 12, 2020).

> Jails and prison[s] are powder kegs for infection. People in jails and prisons cannot practice
> social distancing, control their exposure to large groups, practice increased hygiene, wear
> protective clothing, obtain specific products for cleaning and laundry, avoid frequently
> touched surfaces, or sanitize their own environment.

*Id.*; *see also United States v. Scparta*, 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) ("The risk to

incarcerated individuals . . . is acute; as this Court has explained, individuals in carceral settings are at

particularly high risk for contracting the disease because of the inability to individuals to socially

---

[17]     *Id.*

[18]     *Id.*

[19]     *Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States*, at 2 (Mar. 2, 2020), https://perma.cc/KGP7-PDVJ.

[20]     *See also* Joseph A. Bick, *Infection Control in Jails and Prisons,* 45 Clinical Infectious Diseases 1047–1055 (2007), https://perma.cc/8N4Y-ZRJD; Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://perma.cc/94RG-QR5L.

distance, shared communal spaces, and limited access to hygiene products."). It cannot seriously be disputed that a person's risk of exposure to Covid-19 is significantly greater in prison than it is outside of prison; any claim that BOP facilities generally, or CI Rivers in particular, are as safe or safer than the community-at-large is demonstrably false. *See, e.g.,* Ex. A (Public Health Experts' Letter).[21] Accordingly, "[r]ealistically, the best—perhaps the *only*—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, No. 18-CR-713, 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) (emphasis added); *see also United States v. Foster*, No. 1:14-cr-324-02, ECF No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that Covid-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary").

Prison officials are powerless to reduce breathing, coughing, sneezing, or movement in the cramped, shared spaces of prisons, from the cell blocks and phones to the showers and libraries. Just as it spreads easily in the most controlled environments—like cruise ships and hospitals—the virus spreads easily in prisons, which are the least prepared environments to handle it. In addition, since the start of the pandemic, reports have poured in citing BOP's incompetence at every level, including non-existent education to inmates and correctional officers about the spread of the virus, dubious staffing decisions undermining the safe-keeping of quarantined inmates, and inadequate testing to confirm credible numbers of cases.

Unsurprisingly, Covid-19 cases and deaths in federal prisons have been increasing quickly. The BOP instituted a nationwide lockdown on March 24, and the agency continues to restrict inmate movement in some ill-defined way.[22] Still, the BOP has been ineffectual in containing or controlling the

---

[21]     *See also* Equal Justice Initiative, *COVID-19's Impact on People in Prison*, eji.org (May 11, 2020), https://perma.cc/F5QC-C2NE ("Nationwide, the known infection rate for Covid-19 in jails and prisons is about 2½ times higher than in the general population."); Sarah Betancourt, *Prisoners Testify About COVID-19 Dangers*, Commonwealth Magazine (Apr. 27, 2020), https://perma.cc/K93R-BDUL; ACLU of Oregon, *Testimony to the State's Joint Special Committee on Coronavirus Response*, aclu-or.org (Mar. 18, 2020), https://perma.cc/D3GS-USKJ.

[22]     BOP, *COVID-19 Action Plan: Phase Seven* (May 20, 2020), https://perma.cc/TVK6-58PK.

spread of the virus and protecting the many vulnerable inmates in federal custody.  On May 30, the BOP

reported that 5,231 inmates and 612 staff had tested positive.[23]  Although the Bureau also reported that

3,582 inmates and 420 staff had recovered, "seemingly recovered patients" can "retest[] positive," and "at

least a proportion of recovered patients still may be virus carriers."[24]  In fact, an inmate at FCI Terminal

Island, who had tested positive and was then "converted to a status of recovered" on May 10, 2020, then

died on May 24.[25]  In any case, the BOP's self-reported numbers continue to rise at a rate of growth

approximately six times higher than that of the greater U.S.[26]  At least 66 inmates have died.

Moreover, the BOP's "figures do not accurately reflect the illness and the potential problems

associated with deadly virus spread in prison."[27]  Indeed, the BOP admitted that its numbers

underrepresented the scope of the problem in a congressional briefing held April 7, 2020.  There, the BOP

reported that it lists only positive lab tests and does not publicly report "open" cases, which the BOP

defines as "suspected, presumed positive, or clinically confirmed."  The BOP reported that there were

hundreds of prisoners in isolation (which meant symptomatic, but not necessarily tested) and thousands of

---

[23]     The data reported by BOP is updated daily and available at *BOP: COVID Update*, bop.gov
(2020), https://www.bop.gov/coronavirus/.  It is unclear whether individuals counted as "recovered" are
or were nonetheless contagious when they were permitted to return to the general population or to resume
staff duties.

[24]     Stephanie Pappas, *Can People Spread Coronavirus After They Recover?*, Live Science (Feb. 29,
2020), https://perma.cc/5AF6-4YJE (quoting researchers based in China whose study about reinfection
was published in the Journal of the American Medical Association).

[25]     Press Release, *Inmate Death at the FCI Terminal Island*, BOP (May 27, 2020),
https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf.

[26]     The Federal Defenders of New York, Southern and Eastern Districts, update these statistics daily
at https://federaldefendersny.org/.

[27]     Walter Pavlo, *Federal Judges Are Relying on Bureau of Prisons COVID-19 Numbers To Make
Rulings*, Forbes (May 20, 2020), ), https://perma.cc/Y5J3-59FS; *see also* Timothy Williams et al., *'Jails
Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020),
https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; *see also* Walter Palvo, *Bureau of
Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes (Apr. 1, 2020), https://perma.cc/K4AZ-
3DGH; *United States v. Rodriguez*, 2020 WL 1627331, at *9 (E.D. Pa. Apr. 1, 2020) (explaining why
"[t]he BOP's [rapidly growing number of] reported cases . . . almost certainly underestimate the true
number of infections"); *United States v. West*, No. 1:17-cr-390-AT-1, Corrected Order (Redacted) at 4,
ECF No. 53 (N.D. Ga. Mar. 30, 2020) (recognizing the BOP's "incomplete reporting of COVID-19
cases").

prisoners in quarantine in BOP facilities across the country, which were not reported on the BOP website or otherwise publicly available.[28]

Inconsistencies and anomalies in the BOP's accounting abound.  For example, on May 13, the BOP reported a total of 4,719 positive and recovered cases.  *See* Ex. B (May 13, 2020 BOP Covid-19 Cases).  The next day, on May 14, the BOP reported 34 *fewer total* cases, including fewer of those "recovered."  *Id.* (May 14, 2020 BOP Covid-19 Cases).  The numbers make no sense.

The BOP has also kept some deaths "off the books" completely.  For example, at USP Lompoc, an inmate who appeared to have contracted Covid-19 was put on a bus home (even though he was too sick to walk), only to die thereafter, and he was thus not counted as a USP Lompoc death.[29]  Similarly, on April 17, 2020, a 39-year-old staff member at USP Atlanta died suddenly in her home of Covid-19.[30]  The BOP confirmed the staff member's death to a news outlet, but it does not report the death on its website.[31]  The press reports that, according to a news release provided by the prison, the deceased staff member "had been successfully screened prior to entry [into the prison] and was asymptomatic" the Friday before she was found dead in her home.[32]

---

[28]     At that time, the BOP website reported that only 253 inmates were infected.

[29]     *Lompoc Prison Inmate Dies Amid Worsening Coronavirus Outbreak*, Cal Coast Times (Apr. 17, 2020), https://perma.cc/Y333-LYAB; Richard Winton, *Coronavirus Outbreak at Lompoc Prison is the Worst in the Nation: 69 Inmates, 25 Staff Infected*, L.A. Times (Apr. 16, 2020), https://perma.cc/5Z8Q-ZQEA.

[30]     Cassidy McDonald, *She Was Promoted A Month Before Her Death. Coworkers Say She Was Never Moved Into Her New Role, Away from Sick Inmates*, CBS News (Apr. 20, 2020), https://perma.cc/ABS2-CTTH.

[31]     *See* BOP, *supra* note 23.

[32]     *Atlanta Federal Penitentiary Employee Found Dead Tested Positive for Coronavirus*, WSBTV (Apr. 17, 2020), https://perma.cc/5SSK-ZTQN.

Additionally, in prison, just as in the rest of the United States, there are not enough tests.[33]  And testing matters.  After a court criticized BOP for failing to test inmates and thereby underreporting the infection rate, the agency began mass testing at only a few prisons.  *See Wilson v. Williams*, 2020 WL 1940882, at *11 (N.D. Ohio Apr. 22, 2020) ("it is unlikely that these figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available").  This increased testing unsurprisingly resulted in a massive increase in confirmed cases: in the beginning of May, out of 2,700 tests conducted nationwide by the BOP, nearly 2,000 were positive—roughly 70%.[34]  "At the same time, the Marshall Project [] reported that less than one half of one percent of federal prisoners ha[d] been tested."[35]  Other examples of BOP's failure to account for the number of coronavirus cases in its facilities abound.[36]  Significantly, "states that have responded to prison clusters with comprehensive testing have found that a majority of inmates are positive with coronavirus."[37]

Courts have recognized that "[t]he BOP's containment measures have already proven insufficient to prevent the spread of COVID-19."  *United States v. Rodriguez*, 2020 WL 1627331, at *9 (E.D. Pa.

---

[33]      *See* Katie Thomas, *The Latest Obstacle to Getting Tested? A Shortage of Swabs and Face Masks,* N.Y. Times (Mar. 18, 2020), https://perma.cc/LR5S-3CNC; Lauren Webber et al., *Testing Swabs Run in Short Supply as Makers Try to Speed Up Production*, NPR (Mar. 18, 2020), https://perma.cc/UGX3-3F63; Matthew Perone, *U.S. Virus Testing Faces New Headwind: Lab Supply Shortages*, ABC News (Mar. 21, 2020), https://perma.cc/38KB-VQNE; Robert P. Baird, *Why Widespread Coronavirus Testing Isn't Coming Anytime Soon*, New Yorker (Mar. 24, 2020), https://perma.cc/D6YY-QTEL; Steven Mufson et al., *The Scramble for the Rapid Coronavirus Tests Everybody Wants*, Wash. Post (Apr. 1, 2020), https://perma.cc/4UQN-5ZJA.

[34]      Michael Balsamo, *Over 70% of Tested Inmates in Federal Prisons Have COVID-19*, Associated Press (Apr. 29, 2020), https://perma.cc/2CYP-U8MP.

[35]      Radley Balko, *Stopping Covid-19 Behind Bars Was an Achievable Moral Imperative. We Failed.*, Wash. Post (May 1, 2020), https://perma.cc/C9FR-B24F.

[36]      For example, consider FCI Oakdale, where BOP declared all inmates presumptively infected, stopped testing altogether, and will not release infection estimates.  Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens (Mar. 31, 2020), https://perma.cc/H9QM-33EU.  Consider also FCI Elkton, where the president of the correctional officers' union estimated that inmate infection was 600% greater than BOP's public number.  *Elkton Union President Reports Different COVID-19 Stats than Federal Bureau of Prisons*, WKBN News (Apr. 9, 2020), https://perma.cc/A3QM-3LDN.

[37]      Joseph Neff, *Why Did It Take the Feds Weeks to Report COVID-19 Cases In Privately Run Prisons?*, The Marshall Project (May 8, 2020), https://perma.cc/H3TH-6CT9.

Apr. 1, 2020).  And both parties in Congress are "concerned about how closely BOP is following CDC guidance or taking other preventative measures to adequately protect BOP staff and inmates from the spread of COVID-19" and "worry that BOP is significantly underestimating the rate of COVID-19 infection in BOP facilities because BOP has not yet conducted the number of tests on staff or inmates appropriate for facilities where a highly contagious virus can be easily spread."[38]

## V.        The Covid-19 Crisis at CI Rivers

CI Rivers is a low security, privately-managed facility owned and operated by the GEO Group in Winton, North Carolina.[39]  In an August 2017 Inspection report, the D.C. government documented that, even before the current pandemic, "the poor quality of medical care, especially a general lack of care and inadequate care for chronic care inmates and inmates with serious medical concerns" was one of the primary concerns about the institution's ability to care for D.C. inmates.[40]

Late last month, the BOP confirmed "that the bureau's case tracking [of Covid-19 cases] d[id] not include the privately[-]run prisons," including CI Rivers, which have "a combined capacity for nearly 17,600 inmates"; the Bureau "did not say why."[41]  At that time, however, a North Carolina public health director first "confirmed [that] one inmate and at least three staff members ha[d] tested positive for the virus at Rivers," and the director "did not know when the first positive cases turned up" there.[42]  He also "couldn't attest to whether it was only three staff who ha[d] tested positive because those only reflect staff

---

[38]      Letter to DOJ Inspector General Michael E. Horowitz from U.S. Senators Richard J. Durbin and Chuck Grassley (Apr. 21, 2020), https://perma.cc/AT7S-XZS2; *see* Walter Pavlo, *U.S. Senators Durbin And Grassley Ask Inspector General to Assess Bureau of Prisons Response to COVID-19*, Forbes (Apr. 24, 2020), https://perma.cc/A2QC-YUBZ.

[39]      *See* https://www.bop.gov/locations/ci/riv/.

[40]      D.C. Corrections Information Counsel, Rivers Correctional Institution Inspection Report (Aug. 17, 2017), https://perma.cc/K7BF-6MLJ.

[41]      Dan Kane, *A Second Federal Prison in NC Has Coronavirus Cases, and U.S. Officials Aren't Tracking It*, News and Observer (Apr. 19, 2020).

[42]      *Id.*

who live within his jurisdiction."[43]  Approximately 10 days later, the government proffered that "as of

April 30, 2020, 21 staff and 15 inmates [had] tested positive for COVID-19[.]"[44]

It was not until on or around May 8 that the BOP publicly reported the number of sick prisoners

in 11 facilities run by private contractors, including CI Rivers.[45]  BOP then reported 18 inmate cases at CI

Rivers, and, at that point, the institution "qualif[ied]' as [a] cluster[] of the disease under [CDC]

guidelines."  *Id.*  The "cluster" at Rivers was "twice the size of that reported by federal officials,

according to state health agency numbers that also include staff cases," showing an additional 21 cases

among staff.  *Id.*  Yet, the BOP did not "provide answers sought by doctors and public health experts . . . ,

including how many prisoners were tested and how many guards and other staff members have been

tested or confirmed positive."  *Id.*  On May 15, the BOP reported that eleven inmates and zero staff

members tested positive, even as North Carolina reached its then single-day peak in cases and the state's

cases continued to quickly and unfailingly rise.[46]  Now, the BOP reports 2 inmate cases and 0 staff cases

at CI Rivers.[47]  How Rivers went from 39 to 2 cases in three weeks is a mystery.  Given that one new

coronavirus case can, in close quarters, produce fifteen new ones,[48] the publicly reported numbers are

inconceivable.

Counsel understands that, at CI Rivers, inmates who report symptoms get sent to "the hole": that

is, to solitary confinement.  Thus, it is very possible that some inmates at Rivers have not reported their

---

[43]    *Id.*

[44]    *See* Gov't Opp. Def.'s Mot. Compassionate Release at 12, *United States v. Wheeler*, 19-cr-085
(ESH) (D.D.C. May 1, 2020), ECF No. 61.

[45]    Neff, *supra* note 37.

[46]    *North Carolina Coronavirus Map and Case Count*, N.Y. Times (May 15, 2020),
https://perma.cc/283S-73BR.

[47]    BOP, *supra* note 23.  To view how many cases are officially reported at CI Rivers by the BOP,
one must find the black dot representing Rivers on the map at https://www.bop.gov/coronavirus/ and
hover over it, only to then be provided with the "confirmed active cases" for that single day, without the
historical data on the number of deaths or "recovered" cases provided for BOP-run institutions.

[48]    J Rocklöv et al., *COVID-19 Outbreak on the Diamond Princess Cruise Ship: Estimating the
Epidemic Potential and Effectiveness of Public Health Countermeasures*, J. Travel Med. (28 Feb. 2020),
https://doi.org/10.1093/jtm/taaa030.

symptoms, "fearing they may be abandoned in an isolation cell and left for dead."[49]  Studies show that solitary confinement causes "severe psychological damage."[50]  Symptoms of prolonged solitary confinement include "anxiety, panic, rage, loss of control, paranoia, and hallucinations," "mirror the effects of other forms of torture," and would likely exacerbate an inmate's COVID-19 illness.[51]  Thus, while CI Rivers may be trying to protect inmates by placing those with Covid-19 symptoms in solitary confinement, it is likely discouraging inmates from reporting illness and allowing the spread of Covid-19 to worsen without detection or mitigation.[52]

In light of the lack of transparency about what is occurring at BOP institutions, especially at privately-operated prison institutions like Rivers, the lack of testing, and the way in which symptomatic inmates are being treated, the true extent and impact of the disease at CI Rivers is unclear.  Nevertheless, it is clear that the virus is in community spread at the institution and that it is unlikely to disappear anytime soon.

## VI.    Mr. Boykin's Experience During the Pandemic.

The Covid-19 crisis at Rivers has had a devastating impact on Mr. Boykin's physical and mental health.  The institution has been on "restricted movement" or "lockdown" since on or around March 16, although what this means changes weekly, and sometimes daily.  The "lockdown" restrictions were supposed to be significantly increased on or around April 8, but no action was actually taken until April 15; inmates now refer to the period between approximately March 16 and April 15 as the "fake

---

[49]     Kimberly Kindy, *Inside the Deadliest Federal Prison, the Seeping Coronavirus Creates Fear and Danger*, Wash. Post (Apr. 9, 2020), https://perma.cc/PE2V-34EJ.

[50]     Allison Frankel et al., *The Darkest Corner: Special Administrative Measures & Extreme Isolation in the Federal Bureau of Prisons* 11, Allard K. Lowenstein Int'l Human Rights Clinic, Yale Law School (2017), https://ccrjustice.org/sams-report.

[51]     *Id.* at 11–12.  There is not "a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days failed to result in negative psychological effects." *Id.*

[52]     Rivers officials may not want inmates to report symptoms or illness because, as noted, it is a for-profit corporation.  Rivers is, therefore, responsible for the costs of providing medical care.  *Accord* 2017 D.C. Inspection Report, *supra* note 40 at 14 ("DC inmates repeatedly cited cost as the main factor for whether the facility would provide medical care, rather than inmate need.").

lockdown." During that time, inmates were offered recreation and still ate meals together, though the kitchen staff put yellow "X's" on every other seat for "social distancing." Inmates were permitted to leave their cells in shifts for up to 2.5 hours each day. Because of the number of inmates and limited facilities, that time period was often insufficient for inmates to address their essential needs.

After April 15, Mr. Boykin has largely been confined to his cell, which he shares with a cell mate. There are two showers in his unit (A Unit – Pod 5) for 100 inmates, and after April 15, they were allowed a shower every other day (this has since changed first to once every 72 hours, and then to every day). Worship services, regular or law library access, and indoor and outdoor recreation are no longer offered. Meals are delivered to their cells, by inmates still going back and forth from the kitchen; the meals are more often than not cold by the time they arrive to the unit. In the period between April 15 and May 10, other inmates were still leaving the unit to pick up trash on the compound. As they still do today, staff were cycling between his unit and other units and between his institution and the community.

During this period, inmates were allowed out of their cells in shifts for 20 minutes each day, to use the phone, shower, and buy food from the commissary or get hot water. Between each shift, no one cleaned the surfaces touched by the last inmates. While a disinfectant is provided, it is watered down to the point where it does not smell of any cleaning product whatsoever. Because of the inadequate cleaning supplies, Mr. Boykin was cleaning his cell with dish detergent that he purchased at the commissary, but the commissary then closed down between May 10 and the week of May 25. Mr. Boykin was provided 3 masks at the end of April, which he must wash to reuse.

There are two doctors for the entire Rivers complex, and during this time, not a single temperature check was performed; Mr. Boykin's blood pressure was checked only once. His cellmate fell off his bed one morning, was not seen for a full hour, was then told to fill out paperwork, and still had not been assessed by 3:54 pm that day.

Although generally inmates are kept in the dark about the Covid-19 situation at Rivers, on or about May 6, an officer indicated to Mr. Boykin that each unit (A, B, and C units) had now had Covid-19

cases and that 30 or more individuals were infected with Covid-19 at CI Rivers; a nurse stated that it was "terrible."

To Mr. Boykin's knowledge, the medical unit at Rivers has 4-5 isolation rooms only. This is not enough, and those with symptoms of Covid-19 are either placed in solitary confinement (SHU) or locked in their cells and not let out. An episode occurred at Rivers in late April or early May that compromised any "lockdown" the institution was attempting to do. Despite the limitations on inmate transfers, a busload of inmates from FCI McDowell arrived at Rivers on or about April 23 and were placed all together in one tier of a unit; the other tier of this same unit, because SHU and the infirmary were full, housed those with Covid-19. An officer mistakenly let the Covid-19-positive inmates out with the transferred inmates; the Covid-19 positive inmates used the phones, mingled with the transferred inmates, and touched a variety of surfaces before the mistake was discovered.

On May 10, Mr. Boykin was further restricted to his cell for "quarantine" based on other inmates displaying coronavirus symptoms. Starting that day, the policy was that all meals were to be delivered to inmates in their cells, inmates were to shower only every 72 hours, commissary was suspended, laundry was to be picked up and delivered twice weekly, and medications were to be delivered to pod. This was the policy. In reality, Mr. Boykin was not given his blood pressure medicine for 12 days, even though he complained twice and his blood pressure was high; at times, laundry was not collected or washed. Then, the week of May 25, the policies appeared to change again: inmates are now allowed out of their cells for 2 hours each day, but to allow for this expanded time, they are now out together with 36 other inmates.

Mr. Boykin, mindful of his serious health conditions, is trying hard to isolate himself, but finds it "impossible" to do so. His family members, too, report his anxiety, and fear for his safety and life.

## VII.    Mr. Boykin's Compassionate Release Request to the Warden.

On April 6, 2020, Mr. Boykin's family members requested from the Warden of CI Rivers that he be considered for compassionate release or home confinement in light of Covid-19, highlighting his "significant episodes of chronic asthma attacks, bronchitis, pneumonia and hypertension, as well as a dangerous bout of Cellulitis acquired in transit." *See* Ex. C (Comp. Release/Home Confinement

16

Request).  Mr. Boykin's family members identified potential employers for Mr. Boykin and detailed a comprehensive release plan including mental health counseling, drug treatment and counseling, and Medicaid and disability insurance.  *Id.*

On April 17, 2020, the Warden of CI Rivers denied the request, stating that Mr. Boykin did not meet the requirements for compassionate release or home confinement because, among other findings, he was "41 years of age not meeting 60 years old or older"; he had "served 30% of his sentence, not meeting at least 50% served"; none of his medical problems related to the aging process; none of his medical problems "substantially diminishe[d] his ability to function in a correctional facility"; "many of his chronic problems can be improved with medications, life style choices, and specialty treatments when needed"; and he does not have a terminal illness or is completely disabled.  *See* Ex. D (Warden Denial).

The Warden recognized that the CDC considered his asthma a condition increasing his risk of Covid-19, but concluded that "many providers are not currently providing hands on Medical care in community due to COVID-19 as [Rivers] is doing with providers in protective gear while still ensuring thorough care" and Rivers "is also offering a much more controlled environment that limits exposure to the community at large," while "[h]ome confinement is not controlled and offers a greater risk of contact with the community" because "there would be nothing preventing him from interacting with any and all family/friend contacts he has from the area[.]"  *Id.* The Warden also stated without further explanation that he was a "high risk" of recidivism.  *Id.*

His family members appealed on his behalf on or about April 25, 2020, addressing the appeal to the Warden of Rivers, and sending copies to the BOP's Mid-Atlantic Regional Office at 302 Sentinel Dr., Annapolis Junct., MD 20701 and to the BOP's central office at 320 First St., NW, Washington, DC 20534.  *See* Ex. E (Comp. Release Appeal).  They noted, *inter alia*, that Mr. Boykin had had no incident reports in the past 12 months; that he has documented conditions of hypertension, pre-diabetes, obesity, bronchitis, sleep apnea, cellulitis and asthma; that he had previously received disability benefits because (due to being struck by the car in 2009) he had an "imbedded Titanium plate in his face, impacting his sinuses, and a metal rod in his leg, preventing him from heavy lifting, standing, or sitting in excess of 30

minutes"; and that he was housed at a low security facility.  *Id.*  They requested more information about Mr. Boykin's PATTERN score, and directed the officials' attention to his comprehensive reentry plan. Neither Mr. Boykin nor his family members have heard anything since.  *Id.*

Mr. Boykin's projected release date is August 17, 2027.  He has served 5 years, 7 months, and 29 days (as of May 30, 2020), which is 37.7 percent of his full term and 43.9% of his statutory term (*i.e.,* the term when good time is taken into account).

### Applicable Legal Principles

In the First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018), Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow a defendant to file a motion for a reduction of sentence based on extraordinary and compelling reasons.  Prior to this amendment, the BOP was the sole entity allowed to file such a request.  Now, a defendant may file such a motion either (1) after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," *or* (2) after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  First Step Act § 603(b).

Section 3582(c)(1)(A) provides, in relevant part, that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that—"

> (i)     extraordinary and compelling reasons warrant such a reduction; or
>
> (ii)    the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's applicable guidance was issued before the passage of the First Step Act and has not been amended to account for the statutory changes to § 3582.  Accordingly, courts

have held that "the most sensible interpretation of the Sentencing Commission's guidance in light of Congress's recent statutory amendments is that 'the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.'" *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *5 (D. Me. July 11, 2019)); *see also United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

Tracking the language of the statute, the Guidelines suggest that a sentence reduction may be warranted if "the court determines that—"

(1)     (A)  extraordinary and compelling reasons warrant the reduction; or

(B)  the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2)     the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3)     the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

The Commission set forth four categories qualifying as extraordinary and compelling: (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, and (4) compelling family circumstances.  *See* U.S.S.G. § 1B.13 appl. n. 1(A)–(C).  But, recognizing these categories might not encompass the wide range of compelling reasons, the Commission added a catch-all—"other reasons"—which may act "in combination" with the prior categories or may act wholly independently.  *See* U.S.S.G. § 1B1.13 appl. n.

1(D).[53]  The Guidelines application notes further recognize that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction."  *Id.* appl. n. 4.  Thus, "[r]ead as a whole, the application notes suggest a flexible approach which considers all relevant circumstances."  *Beck*, 425 F. Supp. 3d at 582.

The First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate."  *Id.* at 579.  Indeed, by permitting defendants to file sentence reduction motions directly with the sentencing court, regardless of whether the BOP has weighed in, the First Step Act reflects Congress's aim to diminish the BOP's control over compassionate release.  *See United States v. Cantu*, 423 F. Supp. 3d at 351 (explaining that "defendants no longer need the blessing of the BOP to bring such motions").

This Court may determine whether a defendant's conditions are extraordinary and compelling independent of the reasons provided by the Commission or the BOP.  Courts have concluded that, after passage of the First Step Act, compassionate release is not limited by the Commission's or the BOP's understanding of "extraordinary and compelling reasons," and that courts can thus determine those reasons.  *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Bellamy*, 2019 WL 3340699, at *2 n. 5 (D. Minn. July 25, 2019) (citing lower court decisions); *Beck*, 425 F. Supp. 3d at 579 (noting the First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate"); *Cantu*, 423 F. Supp. 3d at 349-52.

---

[53]     To the extent that application note 1(D) restricts "other reasons" to those "determined by [the] Director of BOP," it conflicts with the First Step Act's statutory amendments and does not apply.  *See United States v. Cantu*, 423 F. Supp. 3d 345, 350–51 (S.D. Tex. 2019).  Instead, "[r]ead in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."  *Beck*, 425 F. Supp. 3d at 583.  Even before the First Step Act, the Commission recognized "that courts are in a 'unique' position to determine whether such circumstances are present."  *Id.* at 583, 583 n.11; U.S.S.G. § 1B1.13 appl. n. 4.

## Argument

"[I]t is clear beyond cavil that the present global health crisis is like no other in modern times" and that it presents extremely serious health risks to all individuals, especially those who, like Mr. Boykin, are presently detained.  *United States v. Johnson*, No. 15-cr-125 (KBJ), 2020 WL 2515856, at *9 (D.D.C. May 16, 2020).  When Mr. Boykin was sentenced, the sentencing court "did not, and could not, envision requiring [him] to serve the sentence while 'incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic."  *Id*. at *13 (quoting *United States v. Zukerman*, 2020 WL 1659880, at *6 (S.D.N.Y. Apr. 3, 2020)).  For Mr. Boykin, "the mental and physical stress of being detained under the conditions of confinement" at CI Rivers during this unprecedented global health pandemic, "while dealing with established and serious physical and mental health issues," substantially diminishes his "ability to provide the type of self-care within the prison environment that is needed now more than ever" and constitutes extraordinary and compelling circumstances warranting his immediate release from imprisonment.  *Johnson*, 2020 WL 1546422, at *10.  *See also, e.g., United States v. Morris*, No. 12-cr-145 (BAH), 2020 WL 2735651 (D.D.C. May 24, 2020); *United States v. Smith*, No. 14-cr-189 (TSC), Order, ECF No. 76 (May 14, 2020); *United States v. Naranjo*, No. 93-cr-418 (TFH), Order, ECF No. 646 (May 8, 2020); *United States v. Jennings*, No. 18-cr-17 (TSC), ECF No. 30 (Apr. 22, 2020); *United States v. Hammond*, No. 02-cr-294 (BAH), 2020 WL 1891980 (D.D.C. Apr. 16, 2020); *United States v. Curtis*, No. 03-cr-533 (BAH), 2020 WL 1935543 (D.D.C. April 22, 2020); *United States v. Powell*, No. 94-cr-316 (ESH), 2020 WL 1698194 (D.D.C. Mar. 28, 2020).

## I.      Mr. Boykin's Request for Compassionate Release Is Properly Before This Court.

Mr. Boykin requested compassionate release from his institution on April 2, and was denied on April 17.  He appealed on or about April 25, 2020, and has heard nothing since.  Under Section 603(b) of the First Step Act, this constitutes "the lapse of 30 days from the receipt of [a request for compassionate release] by the warden of the defendant's facility."  This motion, therefore, is properly before the Court under the law as amended by the First Step Act.

II.   **This Court Should Grant Mr. Boykin Compassionate Release Because His Physical And Mental Health Conditions Heighten His Risk Of Serious Complications Or Death From Covid-19.**

"[T]he prevalence of a novel and potentially deadly strain of coronavirus in the facility where" Mr. Boykin is housed, "coupled with the established fact that [Mr. Boykin] has certain preexisting medical conditions that put him at higher risk of being harmed if he contracts COVID-19, qualifies as an extraordinary and compelling reason" and warrants a reduction of his sentence. *Johnson*, 2020 WL 2515856, at *2.

It is undisputed that Covid-19 is already at CI Rivers. Thus, it is only a matter of time before its numbers skyrocket (if they have not already), whether or not the BOP decides to test and/or report the numbers. Case studies on similarly close quarters on infected cruise ship populations suggest that, without effective countermeasures, up to 79% of the population at CI Rivers could eventually become infected.[54] In close quarters, one Covid case can generate up to 15 new ones, and even with universal contact tracing-based isolation and quarantine, each case is likely to generate close to two new ones. *Id.* The statistical probability of Mr. Boykin avoiding this growth in case rate—even if BOP were to test and trace *perfectly*—is vanishingly small.

Mr. Boykin's personal history, characteristics, and medical conditions make him particularly vulnerable to Covid-19 and put him in grave danger in a prison environment during this pandemic. As an initial matter, the virus disproportionately affects males and African Americans.[55] Although the CDC does not list gender as an at-risk condition, its data on Covid-19 deaths makes clear that the majority of the 81,372 deaths through May 23 have been men (44,077). *See* Ex. F (COVID-19 Provisional Counts -

---

[54]      J Rocklöv et al., *supra* note 47.

[55]      *See* Chris Mooney et al., *All Across the United States, the Coronavirus is Killing More Men than Women, Data Show,* Wash. Post (Apr. 4, 2020), https://perma.cc/V4QZ-RWG9; Reis Thebault et al., *The Coronavirus is Infecting and Killing Black Americans at an Alarmingly High Rate*, Wash. Post (Apr. 8, 2020), https://perma.cc/J23N-CS8A; Eleanor Cummins, *What We Know About Whom COVID Kills*, Slate (May 1, 2020), https://perma.cc/L3NU-2NTL; Akilah Johnson & Talia Buford, *Early Data Shows African Americans Have Contracted and Died of Coronavirus at an Alarming Rate*, ProPublica (Apr. 3, 2020), https://perma.cc/K4TG-2CF6.

Weekly Updates by Select Demographic & Geographic Characteristics).  In fact, "[t]he risk of men dying of COVID-19 is double that of women."[56]  Meanwhile, of all those infected with Covid-19, "the majority of victims are men," which may have "deep biological roots" centered on how women's bodies are better at fighting off infection.[57]

Further, emerging "data and census demographics shows that counties that are majority-black have three times the rate of infections and almost six times the rate of deaths as counties where white residents are in the majority."[58]  The CDC's own statistics support that Covid-19 is "infecting and killing black Americans at a disproportionately high rate," so much so that this "emerging stark racial disparity led the surgeon general [] to acknowledge in personal terms the increased risk for African Americans[.]"[59]  The CDC has made clear that "current data suggest a disproportionate burden of illness and death among racial and ethnic minority groups,"[60] and that "even though African Americans accounted for 18 percent of the population, they made up 33 percent of people hospitalized."[61]  The Surgeon General suggested that this likely "'represent[s] [the] legacy of growing up poor and black in America,'"[62] while the CDC posits an additional cause:

> Racial and ethnic minority groups are over-represented in jails, prisons, and detention centers, which have specific risks due to congregate living, shared food service, and more.[63]

The CDC also notes that "[s]tigma and systemic inequalities may undermine prevention efforts, increase levels of chronic and toxic stress, and ultimately sustain health and health care disparities."[64]

---

[56]    *See* Kashmira Gander, *Men Twice As Likely to Die Frim COVID-19 Than Women, Study of Chinese Coronavirus Patients Suggests*, Newsweek (Apr. 29, 2020), https://perma.cc/QUY9-XMZ6.

[57]    *See* Mooney et al., *supra* note 55; *see also* Ex. I (Declaration of Dr. Chris Beyrer), at ¶6.

[58]    *See* Thebault et al., *supra* note 55.

[59]    *Id.*

[60]    CDC, *COVID-19 in Racial and Ethnic Minority Groups,* https://perma.cc/NA9B-NN4H.

[61]    *Id.*

[62]    *See* Thebault et al., *supra* note 55.

[63]    CDC, *COVID-19 in Racial and Ethnic Minority Groups, supra* note 60.

[64]    *Id.*

The CDC warns that "[p]eople of all ages with underlying medical conditions" are "at high-risk for severe illness from COVID-19."[65]  Experts are only starting to understand all the ways in which Covid-19 attacks its victims and damages various organs and systems.  Yet, clinicians are now recognizing that it does not simply "clo[g] the tiny air sacs in the lungs, choking off the body's oxygen supply," but may also cause "heart inflammation, acute kidney disease, neurological malfunction, blood clots, intestinal damage and liver problems."[66]  For this reason, a wide variety of underlying medical conditions put individuals at risk of being in that category of patients unable to withstand the virus's assault.

*Severe Obesity.*  Mr. Boykin has a body mass index of 40-41.  The CDC warns that "[s]evere obesity, defined as a body mass index (BMI) of 40 or above, puts people at higher risk for complications from COVID-19."[67]  It explains:

> Severe obesity increases the risk of a serious breathing problem called acute respiratory distress syndrome (ARDS), which is a major complication of COVID-19 and can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients. People living with severe obesity can have multiple serious chronic diseases and underlying health conditions that can increase the risk of severe illness from COVID-19.[68]

This is borne out in the data: a recent French study on those hospitalized and those who died of Covid-19 documented that "obesity . . . [was] linked to a greater likelihood of severe disease."[69]

*Asthma.*  Mr. Boykin also suffers from asthma.  Asthma, by definition, is a lung condition in which the airways in the lungs narrow and swell, making it difficult to breathe.  The swelling can also produce extra mucus, which can make it even more difficult to obtain an adequate oxygen supply.[70]  Dr.

---

[65]     CDC, *People Who Are at Higher Risk for Severe Illness*, https://perma.cc/K5LM-4QL.

[66]     Lenny Bernstein et al., *Coronavirus Destroys Lungs. But Doctors are Finding Its Damage in Kidneys, Hearts and Elsewhere*, Wash. Post (Apr. 15, 2020), https://perma.cc/J9YU-WHZ5.

[67]     CDC, *Groups at Higher Risk for Severe Illness: Severe Obesity*, https://perma.cc/2HKY-3MTX.

[68]     *Id.*

[69]     N.Y. Times, *A French study found 1 in 10 diabetic patients with Covid-19 died within a week of being hospitalized* (updated May 29, 2020), https://nyti.ms/2TJ0GN1.

[70]     Mayo Clinic, *Patient Care & Health Information: Diseases & Conditions: Asthma*, https://perma.cc/UUQ6-T2AX.

Lakiea Wright, a specialist in allergies and immunology, noted, "You can imagine if a virus that causes extra inflammation gets in there, then that's going to be worse . . . Those are the patients who might end up on ventilators to help with breathing because Covid-19 is doing a lot of damage in the lungs."[71]

Although "the data analysis on the effects of asthma is in its infancy," health experts cite "an existing body of research that shows the flu and milder coronaviruses exacerbate asthma."[72]  Indeed, "viral infections are the No. 1 cause of asthma flares in both children and adults under normal conditions,"[73] as Mr. Boykin experiences each time he has a mild cold and his asthma gets worse. Additionally, those with asthma may confuse Covid-19 symptoms with asthmatic symptoms, leaving them unaware they need to seek a different remedy than reaching for their inhaler.[74]

Thus, the CDC makes clear that "[p]eople with moderate to severe asthma may be at higher risk of getting very sick from COVID-19 [because] COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[75]  These concerns have unfortunately come to fruition, with recent numbers showing that 12.2% of those hospitalized with Covid-19 have asthma.[76]

*Obstructive Sleep Apnea*.  Mr. Boykin also suffers from severe obstructive sleep apnea, for which he requires a CPAP machine every night to sleep; he also has sinus problems because of the titanium plate in his face.  The French study described above found that "[o]bstructive sleep apnea []

---

[71]     Sandee LaMotte, *Asthma and Coronavirus: Act Now to Decrease Your Chance of a Serious Outcome*, CNN (April 21, 2020), https://perma.cc/VAE5-NEL6.

[72]     Danny Hakim, *Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows,* The New York Times (Apr. 16, 2020), https://perma.cc/8FHN-6M3X.

[73]     *Id.*

[74]     *See* LaMotte, *supra* note 71 ("Many of the key signs of Covid-19, such as coughing, shortness of breath and chest tightness, are also typical symptoms of asthma. Other potential Covid-19 signs, such as sneezing, runny nose, red eyes and fatigue, can mimic allergy responses.").

[75]     CDC, *People with Moderate to Severe Asthma*, https://perma.cc/9WSD-DUFY.

[76]     CDC, *COVIDView: A Weekly Surveillance Summary of U.S. COVID-19 Activity* (May 15, 2020), https://perma.cc/2UCH-WTEX ("Among 3,734 hospitalized adults with information on underlying medical conditions, 91.7% had at least one reported underlying medical condition").

raised the risk of early death in these patients."[77]  For those with diabetes, obstructive sleep apnea,

obesity, and other conditions highlighted by the study, the lead doctor stated in no uncertain terms:

> This is serious[.] If you have [one of the listed conditions], be very careful. Keep away
> from the virus. Go on with social distancing, wash your hands carefully, keep people away
> who can bring you the virus. . . You are not the kind of person who can afford to disregard
> these rules.

**Hypertension.**  Mr. Boykin also suffers from high blood pressure, and has had difficulty regularly

obtaining his medication while on lockdown.  His blood pressure is consistently so high that he falls

within "Hypertension Stage 2," which is "when blood pressure consistently ranges at 140/90 mm Hg or

higher."[78]  This is the stage before "hypertensive crisis," which can result in a stroke, heart attack, or

damage to the eyes and kidneys, among other outcomes.

People with high blood pressure "are among those who are at heightened risk for more severe

complications should they contract Covid-19."[79]  High blood pressure, or hypertension, is a

cardiovascular condition that "forces the heart to work harder to deliver blood to the body" and, over

time, thickens the left ventricle and weakens the heart muscle, which to can lead to a heart attack or heart

failure.[80]  The CDC Clinical Guidance, updated May 20, 2020, states that hypertension is associated with

"increased illness severity and adverse outcomes" from Covid-19, leading to a case fatality rate more than

six times higher than for those without underlying medical conditions.[81]  Researchers are consistently

finding the same.[82]  It is in fact the top comorbidity of those who have died of Covid-19 in New York

---

[77]     *A French study, supra* note 69.

[78]     *See* American Heart Association, *Understanding Blood Pressure Readings*,
https://perma.cc/L9LT-DZTJ.

[79]     Ryan Prior, *Those With High Blood Pressure Are at a Greater Risk for Covid-19.  Here's What
You Need to Know to Protect Yourself*, CNN (Apr. 17, 2020), https://perma.cc/S9PE-7XCY.

[80]     Mayo Clinic Staff, *High Blood Pressure Dangers: Hypertension's Effects on Your Body*,
mayoclinic.org (2020), https://perma.cc/K8EF-HQUS.

[81]     *See* CDC, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus
Disease (COVID-19)*, https://perma.cc/6HMC-KMDX.

[82]     T.M. Cook, *The importance of hypertension as a risk factor for severe illness and mortality in
COVID-19* (Apr. 27, 2020), https://onlinelibrary.wiley.com/doi/full/10.1111/anae.15103; Kenneth
McIntosh MD,  Coronavirus disease 2019 (COVID-19): Epidemiology, virology, clinical features,

State.[83]  *Cf. Hammond*, No. 02-cr-294 (BAH), ECF 51 at 17 ("defendant has also been diagnosed with

hypertension and Hepatitis C, both serious medical conditions in their own right"); *United States v.*

*Johnson*, 2020 WL 2515856 (D.D.C. May 16, 2020) (KBJ) (granting compassionate release in part based

on defendant's high blood pressure).

What is more, Mr. Boykin now has hypertensive retinopathy, which is a form of "target-organ

damage" that occurs when "retinal vessels get destroyed due to elevated blood pressure."[84]  This type of

retinal damage occurs after "more prolonged or severe hypertension,"[85] with retinopathy incidence

"related to the degree of severity and duration of HTN [hypertension]."[86]  There is "significant evidence

that hypertensive retinopathy acts as a predictor of system morbidity and mortality due to [target-organ

damage]."[87]

*Diabetes*.  Mr. Boykin is also prediabetic, which means that his blood glucose numbers are on the

cusp of diabetes, though just short of it at the time of his March 2020 test.  The American Association of

Clinical Endocrinologists reports that "[d]iabetes and high glucose levels are associated with increased

complications, respiratory failure and mortality in hospitalized patients with COVID-19."[88]  The CDC

also states that those with diabetes are at higher risk for severe illness from Covid-19,[89] and a recent study

found that "1 in 10 diabetic patients with Covid-19 died within a week of being hospitalized," while

---

diagnosis, and prevention (May 27, 2020), https://perma.cc/DP83-J6MG; National Foundation for
Infectious Diseases, *Common Questions and Answers About COVID-19 for Older Adults and People with
Chronic Health Conditions* (updated May 7, 2020), https://perma.cc/9ZC4-TLDG.

[83]      New York State Department of Health, *Fatalities*, https://on.ny.gov/3gzA5vL.

[84]      Pranav Modi et al., *Hypertensive Retinopathy*, StatPearls (Jan. 8, 2020),
https://www.ncbi.nlm.nih.gov/books/NBK525980/.

[85]      Mehta, *supra* note 3.

[86]      Modi et al., *supra* note 84.

[87]      *Id.*

[88]      American Association of Clinical Endocrinologists, *AACE Position Statement: Coronavirus
(COVID-19) and People with Diabetes* (Updated March 18, 2020), https://perma.cc/P6D4-EQQK.

[89]      CDC, *Groups at Higher Risk for Severe Illness: Diabetes*, https://perma.cc/HW6G-LMNL.

"[a]nother 20 percent were put on ventilators to assist with breathing by the end of their first week in the hospital."[90]

*Depression.*   Mr. Boykin also suffers from a major depressive disorder and PTSD.  According to medical and mental health professionals, "[i]ndividuals suffering from serious mental illness can have compromised immunity and are at risk of severe illness and death during the coronavirus pandemic."[91] Individuals like Mr. Boykin, with a history of mental illness, "may become more fearful, agitated, and/or paranoid as a result of being quarantined to their jail cells for prolonged periods," which may substantially diminish their abilities to care for themselves in the prison environment.  *Id*.  This is, in part, why "mental illnesses such as anxiety [and] depression . . . impair immune function and heighten vulnerability to viral infection."  *See* Ex. K (Sapolsky Decl.) at ¶13; *see also Doe v. Barr*, 2020 WL 1820667, at *4 (N.D. Cal. Apr. 12, 2020) ("[g]rowing evidence demonstrates that . . . anxiety/stress, and depression can lead to decreased immune response and increased risk of infections").  As courts have recognized, "a defendant's *mental* health needs may also be the basis for granting compassionate release." *Johnson*, 2020 WL 1546422, at *10 (emphasis in original).  "[T]he challenges of self-care inside a prison where COVID-19 is raging would be especially severe for someone [like Mr. Boykin] who suffers from [major depressive episodes] in addition to his physical vulnerabilities."  *Id*.

All of these vulnerabilities increase the risk that Mr. Boykin will become seriously ill with Covid-19 and the risk that, by the time he is treated, it may be too late.  "The time course of the disease can be very rapid.  Individuals can show the first symptoms of infection in as little as two days after exposure and their condition can seriously deteriorate in as little as five days (perhaps sooner) after that."  *See* Ex. G (Declaration of Dr. Marc Stern) at ¶4.  "Vulnerable people who are infected by the COVID-19 virus can experience severe respiratory illness, as well as damage to other major organs.  Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration

---

[90]     *A French study, supra* note 69.

[91]     *See* Ex. J (Inst. Of Law, Psychiatry, and Public Policy, Univ. of Va. Let. (Mar. 24, 2020)).

and intensive care support." *Id*. at ¶6.  Further, post-infection complications in serious Covid-19 cases include ARDS[92] and lung scarring that can cause "permanent damage."[93]  And "[p]neumonia caused by the coronavirus has had a stunning impact on the [] hospital system" in one of the most hard-hit areas of the United States, with reports that "[b]y the time patients have noticeable trouble breathing and present to the hospital with dangerously low oxygen levels, many will ultimately require a ventilator."[94] Ventilators are currently in short supply in the United States;[95] if Mr. Boykin falls ill, there is no guarantee that he will have access to one.

There is currently no vaccine to prevent Covid-19 and no known cure or antiviral treatment for Covid-19.  What the CDC recommends for those, like Mr. Boykin, who "are at higher risk from serious illness from COVID-19," is to:

- **Stay home if possible.**
- **Wash your hands** often.
- **Take everyday precautions to keep space between yourself and others** (stay 6 feet away, which is about two arm lengths).
- **Keep away from** people who are sick.
- **Stock up on supplies**.
- **Clean and disinfect** frequently touched services.[96]

Specifically for those with asthma, the CDC recommends that people avoid crowds, "stay home as much as possible to further reduce your risk of being exposed," and "avoid touching high-touch surfaces."[97] Mr. Boykin can follow nearly none of these suggestions.

---

[92]    The Cleveland Clinic, *Here's the Damage Coronavirus (COVID-19) Can Do to Your Lungs* (Mar. 20, 2020), https://perma.cc/2BZ8-MSZ9.

[93]    Lois Parshley, *The Emerging Long-Term Complications of Covid-19, Explained*, Vox (May 8, 2020), https://perma.cc/8KZA-YE88.

[94]    Richard Levitan, *The Infection That's Silently Killing Coronavirus Patients*, N.Y. Times (Apr. 20, 2020), https://perma.cc/FR9A-QH2L.

[95]    *See* Kyle Cheney, *FEMA Tells Lawmakers Most New Ventilators Won't Be Ready Until June*, Politico (April 2, 2020), https://perma.cc/FQ2Z-BKTN.

[96]    CDC, *What You Can Do*, https://perma.cc/PR68-W7AG (emphasis in original).

[97]    CDC, *People with Moderate to Severe Asthma, supra* note 75.

"Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19." *See* Ex. H (Declaration of Robert B. Greifinger, MD) at ¶8 (emphasis added).  But even if Mr. Boykin were able to wash his hands assiduously in BOP custody, he simply cannot socially distance in prison.  The high infection rate of Covid-19 and high mortality rate for those with pre-existing conditions, coupled with the proven inability of the BOP to address a surge in cases, makes clear that these are just the kind of extraordinary and compelling circumstances that warrant a sentence reduction in this case.  This Court should order Mr. Boykin's immediate release.

**V.    Mr. Boykin Is Not A Danger To The Community And His Continued Incarceration Is Greater Than Necessary To Accomplish The Goals Of Sentencing.**

The § 3553(a) factors also support compassionate release.  Mr. Boykin has already been significantly punished and is not a danger to the community.  *First*, Mr. Boykin's offense, while a serious one for which he is deeply remorseful, was not a violent offense, and there is no violence alleged in his past.  He received a sentence of 180 months, but this was predicated on a career offender designation that overstated the seriousness of his criminal history.  He was designated a career offender on the basis of a 1998 conviction for $20 of cocaine that would not have counted but for a probation violation that the probation office itself recognized was due to "his drug use and failure to complete drug treatment."  PSR ¶158.  What is more, his other predicate offense involved 11.5 grams of heroin.  In other words, Mr. Boykin's substance abuse disorder rendered him a career offender.

The United States Sentencing Commission has itself recommended that the career offender provision focus on those with at least one violent crime and *not* apply to those with drug-only offenses: "Drug trafficking only career offenders are not meaningfully different from other federal drug trafficking offenders and should not categorically be subject to the significant increases in penalties required by the career offender directive."[98]  The career offender "significant[ly] increase[d]" Mr. Boykin's Guidelines range and affected his ultimate sentence.  Applying the career offender provision, Mr. Boykin's 180-

---

[98]    *See* U.S. Sentencing Commission, *Report to Congress: Career Offender Sentencing Enhancements* (Aug. 2016), https://perma.cc/7XMA-ED5U.

month sentence was a 31.3% decrease from the low end of the career offender Guidelines range.  The non-career offender range would have been 121 to 151 months; a 31.3% decrease from 121 months is a sentence of approximately 83 months; and he has now served just a day shy of 68 months.  That the Sentencing Commission itself believes that Mr. Boykin should not have been subject to the career offender provision underscores that the negotiated sentence was higher than necessary to accomplish the goals of sentencing, and that a lower sentence commensurate to the non-career offender range would have served all of § 3553(a)'s purposes.

*Second*, that a lower sentence would have been sufficient but not greater than necessary is supported by the rehabilitation Mr. Boykin has accomplished in prison.  In the nearly six years he has been away from his young children and his aging parents, Mr. Boykin has taken a clear-eyed look at who he was, the choices he made, and who he wants to be.  He does not want to be away from his children; he does not want to miss their graduations and their birthdays.  He only recently realized how much aging his parents have gone through since he was imprisoned; they were regularly traveling to see him throughout his imprisonment until 2 years ago, when they were unable to travel as frequently or as far.  This was a wake-up call: his parents are getting older and he is not there to help.  He thought about the tangled web that being hit by a car, his mother's death, his depression, and his PTSD had trapped him in, and also what he had taken from the community by dealing drugs, how he had shaken its trust and upset its stability.  He came to more deeply understand the damage he had done with the cycle of drug addiction he was in, and he wanted out.

So he worked at it.  He could no longer turn to drugs to wrestle the demons in his mind, so he found other ways.  He wrote as a form of therapy, and completed a novel in the genre of urban fiction while imprisoned, about 3 individuals from socio-economically diverse backgrounds in Washington, D.C.: one went to college and struggled with an addiction to money; one didn't go to college and struggled with drugs; one played sports and got hurt and had to pick the pieces of his life back up and move on.

He relied on his connection to his now-fiancé, Tane Terrell, who works as a surgical technician on a labor and delivery ward, for inspiration; he was in awe of the work she did, and is even more so today by her commitment to the community during the pandemic.  He asked himself, how can I give back like she does? He does not want to wait until he is nearing 50 years old to put the pieces of his life back together.  He wants to start paying his debt back to society by being *in* society, by raising his own children, helping his own parents as they have unfailingly helped him, and providing guidance to others stuck in the same cycle of drug abuse he was in.

Mr. Boykin demonstrated his rehabilitation in other ways.  He is now at a low security facility, but his points allow him to be transferred to a minimum security camp whenever the BOP processes it. *See* Sealed Ex. K (Classification Form).  He followed the rules of the prison environment, save for three minor 300-level incidents where he was found with tobacco and cigarettes and was in an unauthorized area.[99] *See* Sealed Ex. L (Inmate Discipline Data).   He took classes (Real Estate Investing (34 hours), Money Management (22 hours), and Black History (7 hours), among others.  *See* Sealed Ex. M (Inmate Education Data).  In May 2016, he took a drug education class and is committed to being in drug counseling upon his release, but he is still waiting for both the residential (500-hour) drug treatment program (he was referred January 27, 2020) and the non-residential drug treatment program (he has been waiting since October 4, 2019).  *See* Sealed Ex. A.  He worked as a POD orderly on the 5pm to 9 pm shift before his institution was placed into lockdown.  *Id.*  He has tried to demonstrate his growth through his actions, through his continued connection to his family, and through his plans to take control of his own future.

*Third,* because of his significant health problems, Mr. Boykin "has served much of his sentence while seriously ill and in physical discomfort."  *United States v. Andre Williams*, No. 3:04cr95/MCR,

---

[99]     He has a fourth incident report from March 2017, *id.*, but this relates to a fight with another inmate in custody when he was a 22-year-old in 2001 that was never adjudicated at the time.  The other incidents pre-date his incarceration in this case, with the last incident from 2001 related to returning to the halfway house 1-2 hours late.  *Id.*

Order at 11, ECF No. 91 (N.D. Fla. Apr. 1, 2020).  "This means that his sentence has been significantly more laborious than that served by most inmates.  It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)."  *Id.* (quoting *United States v. McGraw*, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019)).[100]

 *Fourth,* realizing the danger of Covid-19 in detention facilities, courts all over the country are acknowledging the uncontroverted evidence that it is *safer for the entire community* if inmates, like Mr. Boykin, who have pre-existing medical conditions and who do not pose any immediate danger to others, are released.  *See, e.g., Karr v. Alaska*, 2020 WL 1456469, at *2 (Ct. of App. Alaska Mar. 24, 2020) (citations omitted) ("Incarcerating a defendant under conditions that do not permit compliance with widespread health directives designed to halt the spread of the virus poses significant health risks not only to other inmates and to correctional facility staff, but also to the rest of the public.").[101]  This is safer for CI Rivers and the larger community as a whole, because, by shrinking the inmate population, "it allows for greater social distancing, which reduces the chance of spread if the virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees."  *See* Ex. G (Dr. Stern Decl.) at ¶9.  It also protects local

---

[100] Mr. Williams was tragically granted compassionate release too late: he died of Covid-19 on the morning his family member was driving to his institution to pick him up.

[101] "[A]ll prisoners, even those that remain detained, benefit from the release of some inmates to counter overcrowding because the detained inmates are that system's next potential victims." *Banks v. Booth*, 2020 WL 1914896, at *5 (D.D.C. Apr. l 19, 2020) (internal quotations omitted). "No man's health is an island. If Plaintiffs contract COVID-19, they risk infecting others inside the DOC facilities," and "also risk infecting DOC staff members who work inside DOC facilities but also live in the community, thus increasing the number of people vulnerable to infection in the community at large . . . if Plaintiffs contract COVID-19 and experience complications, they will be transported to community hospitals— thereby using scarce community resources (ER beds, general hospital beds, ICU beds). As such, ordering Defendants to take precautions to lower the risk of infections for Plaintiffs also benefits the public." *Id*. at *12 (internal quotations and citations omitted).

hospitals from being overwhelmed.[102]  Thus it is safer for both Rivers and the community in which Rivers

is housed that those who pose little risk be removed from it.

*Fifth*, "[a]ny limited risk can be mitigated by supervision."  *Bellamy*, 2019 WL 3340699, at *6.

Indeed, Mr. Boykin will be on strict conditions of supervision upon his release for a 5-year period of time.

A reduction of Mr. Boykin's sentence to time served would not diminish the seriousness of his offense,

nor would it place the public in any danger, and because of his serious health conditions and the Covid-19

pandemic, "a longer sentence would be greater than necessary to serve those purposes."  *Beck*, 2019 WL

2716505, at *12.  The extraordinary and compelling circumstances presented by the uncontrolled spread

of Covid-19—compounded by the heightened risks faced by Mr. Boykin, in particular, whose ability to

engage in basic self-protective measures is restricted and whose underlying medical conditions pose grave

concerns—warrant relief.

*Finally*, although Mr. Boykin believes his existing conditions of supervised release are sufficient

to protect the public, this Court may require that Mr. Boykin serve some or all of his supervised release

term on a form of home confinement or location monitoring.  *See, e.g., United States v. Powell*, No. 94-

cr-00316 (ESH), ECF No. 98 at 72 (Amended Order) (Mar. 28, 2020); *United States v. Ghorbani,* No. 18-

cr-255 (PLF), ECF No. 134 at 5 (Amended Judgment) (Apr. 6, 2020).  Whether home confinement or

location monitoring is a part of Mr. Boykin's supervised release term, he must be released from Rivers

*now*, before he contracts the virus.

---

[102]     Lauren-Brooke Eisen, *The former chief medical officer of NYC Correctional Health Services warns that the situation for people behind bars is deteriorating*, Brennan Center for Justice (May 4, 2020), https://perma.cc/3D88-QJGF ("The spread of Covid-19 in correctional systems has had a profound impact on local hospitals. We have already seen several cases such as in Joliet, Illinois, where a single correctional facility can overwhelm the nearby hospital in just a couple of days. Sending even a single sick patient to the hospital is disruptive both for jail operations and for the hospital, because you're sending one person with two armed correctional officers. For most facilities, if you send in 15 patients a day, you completely deplete your correctional staff (who are often working overtime), and you essentially take over the hospital — certainly at least the emergency room. There are few hospitals in the country that can handle that many sick patients and the logistics involving armed guards.").

VI.     **Mr. Boykin's Release Plan.**

Upon his release, Mr. Boykin will live with his father and step-mother in their 6-bedroom home in Northwest Washington, D.C.  Mr. Boykin will have his own room and ample space to self-isolate, and his family is already taking safety measures to protect themselves and their home from Covid-19.  There, once it is safe, he will be able to see his children whom he misses desperately.  Although Mr. Boykin owns his own home in Prince George's County, he has a tenant whom he does not want to disturb. Instead, he and Ms. Terrell plan to eventually move in together in her home in D.C., once the crisis from working healthcare during a pandemic subsides.

Mr. Boykin and his family already have a comprehensive release plan in place.  Mr. Boykin has connections to various area mental health providers and will turn to them again on his release for support transitioning back into the community.  He has health insurance, and his doctor, Dr. Musa Momoh, is ready and able to take on his complex care again.  He will connect with Probation immediately upon his release to work together to secure drug treatment so that he can continue the sobriety he has worked so hard for in prison.  Ms. Terrell, as a health care professional, will be a strong support for both his physical and mental health needs.

Because of the seriousness of Mr. Boykin's 2009 accident, he has been on disability and will likely access those benefits again.  He has, however, secured a position that he can do within the limits of his physical abilities.  His best friend owns a landscaping company called Mr. Lawn and Garden, and has offered Mr. Boykin the opportunity to lead his salesforce, which would entail advertising for the company and scheduling the work flow.

Having the ability to self-isolate and the added emotional support of his family and fiancé will be a welcome change from Rivers for Mr. Boykin, where, contrary to the Warden's denial letter, his exposure to Covid-19 is *not* limited and "thorough care" is not possible in the midst of a pandemic for an individual with as many risk factors as Mr. Boykin has.  At home, he will "prevent[] him[self] from interacting with any and all family/friend contacts he has from the area" because he wants to live, not die

of Covid-19.  There can be no doubt that living at his parent's home, where he may actually abide by

CDC guidelines, is safer for Mr. Boykin than remaining in prison.

### Conclusion

"People do not stop being human the day they are sentenced.  Although some have made terrible

choices or engaged in reprehensible behavior, the sentence they received for their crime did not include

contracting COVID-19 and death."[103]  Mr. Boykin respectfully requests that this Court decide his motion

on an emergency basis, grant him compassionate release, and order his immediate release from Rivers.


Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
JOANNA MUNSON PERALES
Research & Writing Attorney
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500

---

[103]     DA Rachael Rollins, *Statement of Suffolk County District Attorney Rachael Rollins on today's hearing before the Supreme Judicial Court* (Mar. 31, 2020), https://perma.cc/CU4C-S3TW.